UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOSAIA KANAVALE SEKONA,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>SHERIFF ALEX VILLANUEVA, et. al,<br><br>　　　　　　　Defendants. | Case No. 2:21-cv-00722-JGB-KES<br><br>REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

This Report and Recommendation ("R&R") is submitted to the Honorable Jesus G. Bernal, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

Pro se inmate Plaintiff Sosaia Kanavale[1] Sekona ("Plaintiff") filed the instant 42 U.S.C. § 1983 action alleging that in October 2020, his Eighth Amendment right

---

[1] Plaintiff's filings identify his middle name as Kana**v**ale. California records identify his middle name Kana**d**ale. See, e.g., www. inmatelocator.cdcr.ca.gov.

1

to be free of cruel and unusual punishment was violated when Los Angeles County failed to fix his clogged toilet at the Men's Central Jail ("MCJ") promptly, exposing him to a nauseating smell for several days and depriving him, at times, of access to a usable toilet. (Dkt. 1.)

After a screening order (Dkt. 4), Plaintiff filed the operative First Amended Complaint ("FAC"). (Dkt. 9.) After a second screening order (Dkt. 11), Plaintiff voluntarily dismissed the individual defendants (Dkt. 12) and chose to proceed solely against Los Angeles County Sheriff Alex Villanueva in his official capacity ("Defendant"). (Dkt. 15 [order directing service].)

On April 29, 2022, after the discovery cutoff date had passed, Defendant moved for summary judgment, arguing that undisputed facts show that the County does not have a policy or practice that caused Plaintiff's alleged injury.[2] (Dkt. 28 [the "Motion"].) The Motion was accompanied by a Separate Statement of Uncontroverted Facts ("SSUF" at Dkt. 28-1) and evidence including a declaration from Sergeant Alfred Aguilar of MCJ's logistics unit, the unit that administers maintenance workorders (Dkt. 28-2) and Exhibits A through F (Dkt. 28-3, 36-1).

On May 3, 2020, the Court instructed Plaintiff to oppose the Motion by June 1. (Dkt. 30.) When the Court did not receive a timely opposition, it issued an Order to Show Cause ("OSC") why the Motion should not be considered without opposition. (Dkt. 33.)

On July 22, 2022, Plaintiff filed a "Declaration for Extension of Time to Complete Discovery Request." (Dkt. 34.) Plaintiff advised that in April 2022, he sent a Public Records Act request or a Freedom of Information Act request to

---

[2] Defendant also argues that he is entitled to qualified immunity, but "the defense of qualified immunity … is available only to officials sued in their individual capacity." Whitely v. CDCR, No. CV 18-1103-AG-AGR, 2018 U.S. Dist. LEXIS 221086, at *7 n.4 (C.D. Cal. Dec. 19, 2018). Because Defendant is sued only in his official capacity, the Court will not address this argument.

2

"defendants" seeking "major misconduct reports," use of force reports, "statements of witnesses," disciplinary charges, and other records "concerning these defendant(s)." (Id.) While Plaintiff did not mention the Motion or the OSC, the Court interpreted his filing as a motion to extend his opposition's due date until he received the requested records. The Court denied his motion, because Plaintiff already had sufficient time to complete discovery and the requested records were irrelevant to the Motion, which only concerns MCJ's policies for addressing toilet clogs. (Dkt. 35.) The Court reminded Plaintiff that he still needed to respond to the OSC by July 15 or oppose the Motion. (Id.)

As of the date of this R&R, Plaintiff has neither responded to the OSC nor opposed the Motion, so the Court considered the Motion without opposition.[3] For the reasons discussed below, Defendant's motion is GRANTED.

## II.
## LEGAL STANDARD FOR SUMMARY JUDGMENT

"A party may move for summary judgment, identifying each claim … on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant satisfies this burden, then the opposing party must set forth specific facts, through affidavits or other admissible evidence, showing that there exists a genuine

---

[3] On August 22, 2022, the Court received a "Declaration of C.A. Quiroz Regarding Plaintiff's Legal Mail." (Dkt. 37.) Per this filing, Plaintiff told C.A. Quiroz that on July 15, 2022, Plaintiff gave "legal mail" to C.A. Arellano, but it was "misplaced in back of the copy machine." C.A. Quiroz then gave Plaintiff some "unsealed legal mail," which Plaintiff sealed. C.A. Quiroz signed the envelope, dated it, and mailed it on July 15. The Court does not find this filing relevant to the Motion because (1) C.A. Quiroz did not sign it; (2) Plaintiff does not describe what "legal mail" was involved; and (3) Plaintiff filed an identical unsigned declaration in Sekona v. Yashar, case no. 2:21-cv-01027 at Dkt. 32.

3

factual issue for trial. Fed. R. Civ. P. 56(c)(1).

Even when a motion for summary judgment is unopposed, as here, the movant retains the burden to demonstrate the absence of any issue of material fact. Cristobal v. Siegel, 26 F.3d 1488, 1494-95 (9th Cir. 1994). Trial courts resolving unopposed summary judgment motions must independently evaluate the sufficiency of the moving papers. Id. at 1496.

Plaintiff did not sign the FAC under penalty of perjury.[4] (Dkt. 9 at 26.[5]) Different district courts take different approaches as to whether factual allegations in unverified, pro se pleadings should be considered when a defendant moves for summary judgment. Some courts consider the unverified complaint, but only its factual statements based on the plaintiff's personal knowledge. Other courts refuse to consider the unverified complaint because it is not competent evidence. See Solis v. Pollick, No. ED CV 14-01879-FMO-DFM, 2019 U.S. Dist. LEXIS 87434, at *21 (C.D. Cal. Apr. 2, 2019) (collecting cases on both sides). The Court will consider factual statements in the FAC based on Plaintiff's personal knowledge as if he had declared them under penalty of perjury.

In deciding a motion for summary judgment, district courts "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 516 (9th Cir. 1993). If there is a factual dispute, the Court must accept the non-movant's version of what occurred and must draw all reasonable inferences in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The "mere existence of *some* alleged factual dispute between the parties will

---

[4] A verified complaint may be treated as an affidavit to the extent it is based on personal knowledge. Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995). To "verify" a complaint, the plaintiff must affirm that the facts in the complaint are true under penalty of perjury. Id. at 460. n.10.

[5] Page citations are to the pagination imposed by the Court's e-filing system.

1 not defeat an otherwise properly supported motion for summary judgment; the
2 requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S.
3 at 247-48 (1986). "Only disputes over facts that might affect the outcome of the
4 suit under the governing law will properly preclude the entry of summary
5 judgment." Id. at 248. An issue of fact is genuine if it can reasonably be resolved
6 in favor of either party. Id. at 250-51. "The mere existence of a scintilla of
7 evidence in support of the [non-movant's] position will be insufficient; there must
8 be evidence on which the jury … could find by a preponderance of the evidence
9 that the [non-movant] is entitled to a verdict …." Id. at 252.

## III.
## SUMMARY OF UNDISPUTED FACTS

**A. Plaintiff's Factual Allegations.**

In 2020, Plaintiff was serving a 75-years-to-life sentence following a murder conviction in Los Angeles Superior Court case no. YA091546. (Dkt. 9 at 17); People v. Sekona, No. B272444, 2018 Cal. App. Unpub. LEXIS 707 1 (Jan. 29, 2018) (remanding for resentencing under Senate Bill 620 to permit discretionary consideration of firearm enhancement); People v. Sekona, No. B290733, 2019 Cal. App. Unpub. LEXIS 35 (Jan. 3, 2019) (affirming resentencing).

In September 2020, Plaintiff was housed in MCJ's 2100 Denver Roll Cell 14 ("Cell 14"). (Dkt. 9 at 17.) About a week after a new inmate was assigned to the neighboring Cell 13, its toilet clogged and overflowed. That inmate requested an emergency workorder, and "it took a few days … to fix the toilet." (Id.)

Plaintiff's toilet worked fine until Saturday morning, October 10, 2020, when he heard it "bubbling." (Id.) When he flushed it, water "filled up to the top" of the bowl. (Id.) He asked the inmates in the adjacent cells not to flush their toilets, fearing that if they did, it would cause his toilet to overflow. (Id.) When Plaintiff went to shower that morning, he "informed" two deputies about the clogged toilet. One made a written note and said that he would submit a workorder. (Id. at 18.)

5

After showering, Plaintiff went to breakfast and then returned to his cell. He asked a deputy to use the dayroom toilet, but his request was denied because there were still inmates out of their cells for showers. (Id.) Between 11 a.m. and 12 p.m., Plaintiff asked to use the dayroom toilet again, and again he was told to wait. (Id.) He urinated in the Cell 14 toilet, even though it was filled with "sewage water." (Id.) Sometime before 2 p.m., Plaintiff asked a deputy about the status of the workorder for his toilet. The deputy told him that he would pass on Plaintiff's inquiry to deputies working the next shift. (Id. at 19.)

Plaintiff spoke to a deputy on the next shift and showed him a towel he had draped over the toilet bowl and "sewage water filled to the top of the toilet seat." Plaintiff received permission to use the dayroom toilet. (Id. at 19.) After dinner, Plaintiff asked again to use the dayroom toilet. He was allowed to use the dayroom toilet twice that day. (Id. at 20.) On Sunday, October 11, Plaintiff was again allowed to use the dayroom toilet twice. (Id. at 20.)

On Monday, October 12, the situation "start[ed] getting worse." (Id.) Cell 14's toilet overflowed "sewage water" onto the floor, so Plaintiff asked for cleaning supplies. (Id.) A deputy sent "porters to bring [Plaintiff] extra towels and gloves to clean the floor," but "they ran out of cleaning supplies," so other inmates gave Plaintiff their cleaning supplies to use, which he did. (Id.)

On Tuesday, October 13, deputies expressed surprise that Plaintiff's toilet had not yet been fixed. (Id.) Plaintiff asked to be moved to a different cell and filed two grievances. (Id. at 21.) That afternoon, Plaintiff was denied permission to use the dayroom toilet and defecated on himself. He cleaned himself up using the sink, but running the sink caused his toilet to overflow again, so he then "had to clean the sewage from the floor." (Id.)

On Wednesday, October 14, Plaintiff filed a third grievance. (Id. at 22.) On Thursday, October 15, at about 7 a.m., a plumber came to fix his toilet. (Id.)

On Friday, October 16, Plaintiff had a video call with his public defender.

He told her that he had experienced headaches and difficulty breathing due to the smell from the clogged toilet. (Id. at 22.) She requested a medical check, so Plaintiff was taken to Twin Towers Correctional Facility ("TTCF") where he received medications for headaches and nausea, an inhaler to assist with breathing, and cream for a rash. (Id.)

Plaintiff stayed at TTCF for several days. When he returned to MCJ, he was placed in a different cell. (Id. at 23.) When Plaintiff was later interviewed about his grievances, the interviewer expressed surprise that he was housed in Cell 14 for so long with a clogged toilet. (Id.)

### B. Defendant's Evidence.

#### 1. Housing Evidence.

Defendant's Exhibit F is Plaintiff's Inmate Movement History for Booking #5903105 which shows that Plaintiff was housed in Cell 14 from before October 10, 2020, until he was moved to TTCF on October 16, 2020. (Dkt. 36-1; Dkt. 28-2, ¶ 8.) This is consistent with Plaintiff's allegation that he was moved out of Cell 14 on October 16, 2020. (Dkt. 9 at 22.) Thus, the relevant dates when Plaintiff lived in Cell 14 are undisputed. (See SSUF nos. 1, 3.)

#### 2. Policy and Training Evidence.

Sgt. Aguilar declares that MCJ's maintenance-related policies are communicated to correctional deputies by distributing policy manuals and written "unit orders;" deputies also receive training on jail operations. (Dkt. 28-2, ¶ 2.) Defendant's Exhibits A and B are unit orders while Exhibits C and D are policy manual excerpts, all instructing deputies how to detect and respond to maintenance problems. (Dkt. 28-3.)

Per those policies, MCJ personnel are to look for maintenance problems on a daily basis, with "emphasis" on toilets and sinks. (Dkt. 28-3 at 7.) If deputies observe a problem, they must submit a maintenance request. For routine requests, they use an electronic Uniform Daily Activity Log. Such requests will be reviewed

7

by the logistics office, which serves as a liaison between MCJ and maintenance contractors. (Id. at 7-8.) For emergency requests, deputies are instructed to use a different reporting procedure. (Id. at 8.) The policy lists some examples of emergency situations (like gas leaks or electrical hazards) but also states that emergencies are "not limited" to the listed maintenance problems. (Id.) "Serious water leaks" are on the emergency list, but clogged toilets are not. (Id.) Thus, deputies have discretion to decide when a maintenance problem merits an "emergency" response.

If an inmate is in a cell that "has become contaminated with infectious waste," such as "human waste" overflowing from a toilet, then MCJ deputies "shall attempt to gain the inmate's cooperation in having their cell cleaned." (Id. at 15.) If the cell remains uncleaned, then the inmate "shall not be allowed to remain within the contaminated cell for more than 48 hours." (Id.)

None of Plaintiff's factual allegations controvert Sgt. Aguilar's testimony describing how MCJ deputies are trained to address maintenance problems, so the Court considers those facts undisputed. (See SSUF nos. 5, 10-11, 14.) Similarly, none of Plaintiff's factual allegations controvert the existence or content of the County's policies reflected in Exhibits A-D, so the Court considers those facts undisputed. (See SSUF nos. 4, 6-9, 12-13.)

C. **Workorder Evidence.**

Defendant's Exhibit E is a plumbing workorder for Cell 14. It states that "toilet clogged" was reported on October 14, 2020, and plumbers fixed the toilet on October 19, 2020, by removing a towel from the sewer line. (Dkt. 28-3 at 17.) Defendant proposes that the submission date of the workorder, the date of the repair, and the nature of the repair be accepted as undisputed facts. (SSUF no. 2.)

These dates do not match up with Plaintiff's allegations. But whether the problem was reported on October 10 and fixed on October 15 (Plaintiff's dates) or reported on October 14 and fixed on October 19 (Defendant's date), the duration is

8

the same: the repairs were made five days after the problem was reported. The date discrepancy makes a difference, however, when assessing how long Plaintiff lived in Cell 14 with a clogged toilet. He contends that it was five days (October 10-14), although for the first three of those five days, the toilet merely "bubbled" and filled to the rim without overflowing. In contrast, using Defendant's dates, Plaintiff only lived with the clogged toilet for two days (i.e., October 14 and 15) before he was moved to TTCF on October 16. As explained above, the Court accepts Plaintiff's dates for purposes of ruling on Defendant's motion for summary judgment.

## IV.
## DISCUSSION

**A. Official Capacity/Monell Claims.**

A suit against a county employee in his or her official capacity is "another way of pleading an action against [the] entity of which [the] officer is an agent." Hafer v. Melo, 502 U.S. 21, 25 (1991) (citations omitted). Thus, Plaintiff's official capacity claim against Sheriff Villanueva is equivalent to a claim against Los Angeles County (the "County").

Section 1983 claims against municipal entities like the County are sometimes called Monell claims following Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). To impose Monell liability on the County under § 1983, Plaintiff must prove: (1) he had a constitutional right[6] of which he was deprived; (2) the County had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) the policy is "the moving force" behind the constitutional violation.

---

[6] The Eight Amendment obligates prison officials to provide "humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994). To be unconstitutional, the condition must be "sufficiently serious," and the defendant must have known of but disregarded it. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000). "[D]eprivations of … sanitation" may be sufficiently serious, depending on their duration and other circumstances. Id. at 732. The Motion does not challenge this aspect of Plaintiff's claim, so the Court does not address it.

9

Gordon v. Cty. of Orange, 6 F.4th 961, 973 (9th Cir. 2021).

A plaintiff can satisfy the "policy" element of Monell liability in several different ways. As relevant here, a local government may be held liable when it acts "pursuant to an expressly adopted official policy." Thomas v. County of Riverside, 763 F.3d 1167, 1170 (9th Cir. 2014) (per curiam). Alternatively, a public entity may be held liable for a "longstanding practice or custom," even if it is unwritten and unofficial. Id. at 1170. Liability based on a "longstanding practice or custom" may arise if a public entity fails to train its employees adequately. Gordon, 6 F. at 973. A plaintiff asserting Monell liability based on inadequate training must show that the public entity "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights." Flores v. County of Los Angeles, 758 F.3d 1154, 1159 (9th Cir. 2014); see also Connick v. Thompson, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

### B. Analysis.

Plaintiff alleges that his injuries "would have been avoided if the deputies [at MCJ] would have had the proper training and available plumbing service." (Dkt. 9 at 15.) He further alleges that MCJ should have fixed his clogged toilet on an emergency basis. (Id. at 15-16.) The Court construes these claims as asserting Monell liability based on alleged County policies of (1) not having a procedure to address plumbing emergencies and/or (2) failing to train deputies how to handle plumbing emergencies.

#### 1. The Alleged Lack of Emergency Procedures.

Undisputed evidence establishes that the County had a procedure for reporting and responding to maintenance emergencies. Per unit order 4-02-020, deputies could make "routine" maintenance requests or use a different procedure to request "emergency" repairs. (Dkt. 28-3 at 7-8.) When an emergency repair was

requested, it was expected to be completed within 24 hours. (Id. at 8.)

Plaintiff's factual allegations do not dispute the existence of a procedure for reporting maintenance emergencies at MCJ. Plaintiff alleges that before his toilet clog, MCJ deputies submitted an emergency workorder requesting repairs for a clogged toilet in Cell 13, and that toilet was fixed in just "a few days." (Dkt. 9 at 16.) Plaintiff knew that "workorders are just a notice for the plumbers to come and fix the toilet. But an 'Emergency' workorder is of an urgent need of the plumbers' assistance." (Id. at 21.) He repeatedly asked deputies to put in an emergency workorder for his clogged toilet; Deputy Jones "said he would put an emergency workorder and never did or even forgot to"; Deputy Alvarado told Plaintiff that he had "already put in an emergency workorder." (Id. at 6, 8-9.) Thus, whatever the reason(s) that Plaintiff's clogged toilet was not fixed more quickly, it was not because MCJ lacked a policy for deputies to request emergency repairs.

**2. The Alleged Lack of Training.**

Sgt. Aguilar has been assigned to MCJ for seven years. (Dkt. 28-2 ¶ 1.) As a sergeant in the logistics unit, he is familiar with the County's policies related to facility maintenance at MCJ. (Id.) Deputies working at MCJ receive the Custody Division Policy Manual as well as written unit orders. (Id. ¶ 2.) The deputies are trained on these policies in the academy and though other training programs, including a multi-week "Jail Operations" course provided to all personnel assigned to work at MCJ. (Id.)

Nothing in Plaintiff's FAC refutes this training evidence. To the contrary, Plaintiff alleges that the deputies did "regular security walks" to "make sure that … all cells that are occupied by inmates have toilets that flush and sinks that have running cold and hot water," which is consistent with the County's policy and corroborates that deputies were trained to follow the policy. (Dkt. 9 at 6; Dkt. 28-3 at 7.) Plaintiff alleges that Deputy Jones told him that he would put in an "emergency workorder and never did or even forgot to." (Dkt. 9 at 6.) Deputy

Alvarado told him that he had "already put [in] an emergency workorder." (Id. at 9.) Unnamed deputies put in an emergency workorder when the toilet in Cell 13 overflowed. (Id. at 17.) When he told two different deputies and Sgt. Frazier that he had a multi-day problem with a clogged toilet, they expressed surprise. (Id. at 20, 23.) All these allegations tend to show that the deputies at MCJ were trained to know that emergency maintenance services were available to fix a clogged toilet.

At some point, a non-emergency workorder was requested for the Cell 14 toilet. (Dkt. 28-3 at 17.) The fact that a deputy chose to report the toilet clog as needing "routine" repairs rather than "emergency" repairs does not reflect a lack of training so much as a difference of opinion over what constitutes an emergency. It does not evidence a training deficit, and certainly not a training deficit that the County should have recognized would lead to the "obvious consequence" of MCJ staff violating inmates' constitutional rights. Flores, 758 F.3d at 1159.

## V.
## CONCLUSION

Thus, undisputed facts show that the cause of Plaintiff's injury was not a County policy, custom, or practice. This defeats Plaintiff's sole § 1983 claim against Defendant in his official capacity. IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this R&R; and (2) granting Defendant's Motion for Summary Judgment (Dkt. 28).

DATED: August 29, 2022

_____
KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals but are subject to the right of any party to timely file objections as provided in the Federal Rules of Civil Procedure and the instructions attached to this R&R. This R&R and any objections will be reviewed by the District Judge whose initials appear in the case number.